RECEIVED
IN LAKE CHARLES, LA.
MAR - 1 2012
TONY R. MOORE, CLERK
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| EL PASO E&P COMPANY, L.P. | : | DOCKET NO. 2:09-1753 |
| VS. | : | JUDGE TRIMBLE |
| BP AMERICA PRODUCTION COMPANY, APACHE CORPORATION (OF DELAWARE) | : | MAGISTRATE JUDGE KAY |

## MEMORANDUM RULING

Before the court is a "Motion for Partial Summary Judgment" (R. #47) filed by plaintiff, El Paso E&P Company, L.P. ("El Paso") wherein the mover seeks the following relief against defendant, BP America Production Company ("BP"):

> (1) a judgment holding that BP is liable to El Paso for the value of 6,818.53 barrels of gas condensate and 2,477.83 barrels of retrograde or drip gas condensate.
> (2) a judgment holding that BP owes legal interest to El Paso from the date the obligation to pay El Paso became due.
> (3) a judgment holding that the obligation to pay El Paso became due on September 23, 2005, and the value of condensate on that date be used to calculate the amount owed by BP to El Paso.
> (4) alternatively, a judgment holding that El Paso is entitled to specific performance.

BP opposes the motion and has submitted summary judgment evidence to attempt to create a genuine issue of material fact for trial. BP maintains that the value of the condensate should be set as of the date of the filing of the complaint and amended complaint, which it maintains is the date it was placed in default. BP maintains that prejudgment interest should begin on the date of judicial demand. BP further maintains that El Paso is not entitled to specific performance because such is "impracticable" because it would be greatly disproportionate in cost to the actual damage caused.

## FACTUAL STATEMENT

El Paso, BP and others were parties to a Conveyance and Operating Agreement ("Agreement") for the Grand Chenier Separation Facilities ("Facilities") in Cameron Parish, Louisiana. The Agreement governed the ownership and operation of the Facilities where condensate was separated from oil and gas leases served by the Facilities.[1] The primary objective of the operations of the Facilities was to separate and transport the condensate owned by the parties.[2] Under the Agreement, all condensate handled by the Facilities and saved after separation is owned by the party who committed the condensate to the Facilities.[3] However, the operation necessitated the commingling of the condensate. The Agreement provided a procedure and calculation for determining the quantity of condensate owed by or to each party.[4]

BP was the operator of the Facilities from the year 2000 until October 1, 2006.[5] Under the Agreement, the operator had exclusive control and supervision of the condensate and was vested with the responsibility to effectuate the primary objective of the operations – the proper separation and handling of the condensate.[6] Parties to the Agreement at various times took volumes of condensate greater than their allocation. At other times, these parties took volumes of condensate

---

[1] Complaint, ¶ 2., R. #1.El Paso, BP, Apache and other entities transported oil and gas from offshore leases and production wells to the Facilities, where the condensate was separated from the oil and gas production and stored.

[2] Plaintiff's exhibit 1, § VIII.

[3] Complaint, ¶ 3, R. #1; Plaintiff's exhibit 1, § XI.

[4] Id.

[5] Id.

[6] Complaint, ¶ 4, R. #1; Plaintiff's exhibit 1, § VIII.

less than their allocation, resulting in imbalances.[7] Crude Acquisition and Marketing ("CAM"), BP's marketing agent for the condensate and retrograde production, prepared monthly statements of the imbalances of condensate.[8] El Paso was provided a June 2005 statement as to the 6,818.53 barrels of under-allocated condensate, and 2,477.83 under-allocated barrels of retrograde or drip condensate.[9] However, El Paso complains that BP did not provide it with a statement regarding the proceeds from the sale of the condensate at issue. BP does not dispute this but does assert that it provided monthly statements of under and/or over allocations of condensate.[10]

On or about September 23, 2005, Hurricane Rita struck the coast of Cameron Parish, Louisiana causing the Facilities to cease operations. CAM's statements reflect that El Paso has an under-allocation of 6,818.53 barrels of gas condensate and an under-allocation of 2,477.83 barrels of retrograde.[11] Thus, BP owes El Paso for the value of these under-balances or alternatively, for the delivery in kind of the under-allocated condensate. BP disputes that it owes El Paso in kind for the under-balances.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, when viewed in the light most favorable

---

[7] Complaint, ¶ 5, R. #1; Plaintiff's exhibit 1, § XII.

[8] Plaintiff's exhibit 2, Requests for Admissions and BP's Responses Nos. 1 and 2; plaintiff's exhibit 3, Supplemental Request for Admission and BP's Responses No. 12.

[9] Plaintiff's exhibits 4 and 5, R. #47.

[10] BP statement of material fact, ¶ 3, Defendant's exhibit (not identified), Anthony Webb affidavit.

[11] Plaintiff's exhibits 4 and 5.

to the non-moving party, indicate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[12] A fact is "material" if its existence or nonexistence "might affect the outcome of the suit under governing law."[13] A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.[14] As to issues which the non-moving party has the burden of proof at trial, the moving party may satisfy this burden by demonstrating the absence of evidence supporting the non-moving party's claim."[15] Once the movant makes this showing, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue for trial.[16] The burden requires more than mere allegations or denials of the adverse party's pleadings. The non-moving party must demonstrate by way of affidavit or other admissible evidence that there are genuine issues of material fact or law.[17] There is no genuine issue of material fact if, viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party.[18] If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[19]

---

[12] Fed. R.Civ. P. 56(c).

[13] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

[14] Stewart v. Murphy, 174 F.3d 530, 533 (5th Cir. 1999).

[15] Vera v. Tue, 73 F.3d 604, 607 (5th Cir. 1996).

[16] Anderson, 477 U.S. at 249.

[17] Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

[18] Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

[19] Anderson, 477 U.S. at 249-50.

## LAW AND ANALYSIS

BP does not object to El Paso's assertion of the quantity of condensate owed, rather BP disputes (1) whether or not El Paso is entitled to prejudgment interest and/or the date such interest should start accruing, (2) the date this court values the barrels of condensate, and (3) whether or not BP is obligated to provide specific performance, i.e, the delivery of the under-allocated condensate.

*Date to value condensate and prejudgment interest*

Louisiana Civil Code article 1991 provides that "[a]n obligee may put the obligor in default by a written request of performance, or by an oral request of performance made before two witnesses, or by filing suit for performance, or by a specific provision of the contract." Hence, BP maintains that it was first put on notice of default when El Paso filed its initial and supplemental complaints seeking compensation for the barrels of under-allocated condensate.

BP also maintains that El Paso's claim is not a contractual claim but is quasi-contractual (for unjust enrichment) because the Agreement contained no provision that addressed when the parties "catch up" on under-allocations or over-allocations.[20] In other words the Agreement only addressed the parties rights to take their portion of condensate, while allowing the operator (BP) to either sell or buy the non-operator's portion of condensate at market price and account for the proceeds, or keep and store the condensate for later distribution. BP remarks that the parties' practice was for CAM to sell the condensate.[21] The court notes that the Agreement expressly obligated the operator (BP)

---

[20] Whether or not this case is *ex delicto* or contractual in nature is significant because legal interest attaches to judgments in *ex delicto* actions from the date of judicial demand, whereas interest is recoverable on debts arising *ex contractu* when the debt becomes dues, unless stipulated otherwise. Corbello v. Iowa Production, 850 So.2d 686, 706-707 (La. 2003).

[21] Defendant's exhibit (not identified), Webb aff. ¶ 28, R. #51-2.

to account to the owners of the condensate monthly as to the proceeds of the sale of the under-allocated condensate.[22] Thus, the court finds that El Paso's claim is contractual in nature.

El Paso agrees that under § XII of the Agreement, BP could either deliver the imbalance of condensate to El Paso or sell El Paso's portion at not less than the then prevailing market price.[23] El Paso asserts that BP did neither when Hurricane Rita struck with respect to the 9,296.36 barrels[24] of condensate at issue. Louisiana Civil Code article 1808 provides that an obligation is alternative when the obligor is bound to render only one of two or more items of performance and article 1809 provides that it is the obligor (BP) who has the choice of which obligation to perform.

Louisiana Civil Code article 1812 provides in pertinent part:

> When the choice belongs to the obligor and one of the items of performance contemplated in the alternative obligation becomes impossible or unlawful, regardless of the fault of the obligor, he *must* render one of those that remain.(emphasis added)

---

[22] Plaintiff's exhibit 1, § XII.

[23] Section XII of the Agreement entitled "Taking Production in Kind" provides in part: Each party shall have the obligation to take (or deliver to whomsoever it may desire) its portion of the condensate separated and stored in the Facilities when Operator (BP) has concluded its handling thereof. Said condensate shall be delivered to the party or its vendee or nominee into a barge or barges at the Facilities, or delivered into the proportionate storage facilities owned by such party. . . .In the event any party fails to take its portion of said condensate, or itself sell or deliver such portions to others, Operator shall be entitled, but not required, to sell or buy such party's portion, at no less than the then prevailing market price therefor, and shall account monthly to such party for the proceeds thereof . . . .

[24] 6,818.53 barrels of gas condensate plus 2,477.83 barrels of retrograde or drip condensate for a total of 9296.36 total barrels of condensate.

On September 23, 2005, when Hurricane Rita hit, the Facilities ceased to operate.[25] It is undisputed that BP failed to deliver the condensate and also failed to pay El Paso the market value or the proceeds of the sale of the condensate. It is El Paso's position that at this time BP was unable to deliver El Paso's share of condensate at the Facilities, thus BP could no longer balance El Paso's under-allocation through the operation of the Facilities. BP argues that article 1812 does not address when payment of the obligor is due. However, the Agreement expressly provides that there *must* be a monthly accounting of the proceeds of the sale of the condensate. BP asserts that El Paso's under-allocation occurred long before September 23, 2005, and that El Paso has no authority to make September 23, 2005 the date that the court should value the under-allocated condensate.

El Paso suggests that the Agreement did not provide a specific term for performance under these particular circumstances and relies on Louisiana Civil Code article 1777 which provides that "[p]erformance of an obligation not subject to a term is due immediately." El Paso maintains that BP's obligation to pay it for the value of the production became due on September 23, 2005 when Hurricane Rita destroyed operations at the Facilities making performance impossible for BP to deliver the condensate. El Paso further maintains that because September 23, 2005 was the date the obligation became due, that is also the date the court should set the value of the condensate. BP argues that the September 23, 2005 date is an arbitrary date which has no relation to the price that BP's marketing agent received when it sold El Paso's under-allocated condensate, and that the court should set the price at that which BP's marketing agent received when it sold El Paso's condensate.

BP maintains that the parties course-of-dealing in 2003, 2004, and 2005 raise a fact issue as

---

[25] BP admits that it ceased operations on September 23, 2005. Webb affidavit, ¶ 10. R. #51-2.

to when BP's obligation to bring El Paso current became "due." BP has submitted the affidavit of James Anthony Webb[26] wherein Mr. Webb, the Senior Business Development Negotiator for BP, declares that on September 23, 2005, the Facility was not operating and no persons routed petroleum products to the Facility on that date or at any time thereafter while BP served as the operator of the Facility.[27] El Paso does not dispute this. Mr. Webb further declares that at the end of January 2005, without demand by El Paso to balance its account, BP had over-allocated El Paso a total of 14,214 barrels of gas condensate and at the end of February 2005, without demand by El Paso to balance its account, BP had over-allocated El Paso a total of 20,639 barrels of gas condensate.[28] At the end of September 2005, BP had under-allocated El Paso a total of 6,818.53 barrels of gas condensate.[29] In November and December of 2003, without demand by El Paso to balance its account, BP had under-allocated El Paso a total of approximately 1350 barrels of retrograde or drip gas condensate and from March through August 2005, without demand by El Paso to balance its account, BP had under-allocated El Paso an additional approximately 1120 barrels of retrograde or drip gas condensate.[30] Mr. Webb then declares that it was the practice of all of the users of the Facilities, including BP and El Paso, to resolve under-allocations and over-allocations incrementally over time,[31] and that the practice of the parties was for the operator to sell the condensate and provide all

---

[26] Defendant's exhibit ___ (not identified), R. #51-2.

[27] Id., ¶ 11-12.

[28] Id., ¶ 21.

[29] Id. ¶ 22.

[30] Id, ¶¶ 23-24.

[31] Id. ¶ 27.

parties with a monthly statement.[32]

El Paso remarks that BP has failed to either pay it the value of the condensate or to deliver in kind, the appropriate barrels of condensate for 6.5 years. Neither of the parties have provided this court with evidence of what the proceeds from the sale by BP of the condensate actually were, nor is there any explanation whatsoever as to why BP failed to pay El Paso the proceeds from the sale of the condensate. There seems to be no dispute that at the time the Facilities were destroyed by Hurricane Rita, BP was unable to perform its obligation of delivering the condensate to El Paso. The court finds that even though the Agreement provided that BP would account to El Paso monthly as to the proceeds of the condensate sold, the parties' course of dealings based on the affidavit of Mr. Webb indicate that BP did not strictly abide by the terms of the Agreement, and El Paso did not object to BP's handling of the imbalances. There is no dispute that BP owes El Paso for the value of the condensate. However, the court does not agree that September 23, 2005 should be the date to use to value the condensate. Accordingly, BP has presented sufficient summary judgment evidence to create a genuine issue of material fact for trial as to the date the court should value the barrels of condensate. At the trial of this matter, the court expects that the parties will submit the monthly statements of the imbalances or under-allocations of condensate with specific dates, and the fair market value the condensate and the drip retrograde condensate during each month, in order for the court to designate the proper market value, and/or the monthly statements of the proceeds of the sale of the under-allocated condensate and retrograde or drip gas condensate. The court will then determine the amount BP owes El Paso for the under-allocations.

El Paso maintains that it is owed prejudgment interest from September 23, 2005, the date that

---

[32] Id. 28.

Hurricane Rita struck causing the Facilities to cease to operate. BP disagrees. BP argues that prejudgment interest should begin to run on the date of judicial demand. BP argues that prejudgment interest should begin accruing on the date of default, which it maintains is September 8, 2009 for 6,818.53 barrels of gas condensate and January 19, 2012 for 2,477.83 barrels of retrograde or drip condensate – the dates El Paso filed its supplemental and amending complaints.

BP remarks that the Agreement and the parties' course of dealings did not fix a deadline for correcting under-allocations and over-allocations. The parties' practice or course of dealings was to allow the under-allocations and over-allocations to continue for an indeterminate time and to balance the under-allocations and over-allocations over a period of time, not all at once.[33] Thus, BP argues that because there was no fixed or clearly determinable time for payment for the under-allocations, El Paso had to place BP in default to start the running of pre-judgment interest.

With respect to the accrual of prejudgment interest, El Paso relies on Louisiana Civil Code article 2000 which provides the following:

> When the object of the performance is a sum of money, damages for delay in performance are measured by the interest on that sum from the time it is due, at the rate agreed by the parties or, in the absence of agreement, at the rate of legal interest as fixed by R.S. 9:3500. . . .

Article 1990 of the Louisiana Civil Code provides that "[w]hen a term for the performance of an obligation is either fixed, or is clearly determinable by the circumstances, the obligor is put in default by the mere arrival of that term. In other cases, the obligor must be put in default by the obligee, but not before performance is due."

The court finds that because of the parties' dealings with respect to the handling of the under

---

[33] Defendant's exhibit (not identified), James Anthony Webb affidavit, ¶ 27, R. #51-2.

and over-allocations, it is not clearly determinable when the term for performance was due, even though the Agreement obligated BP to account monthly for the proceeds of the sale of condensate.

BP maintains that it was not put on notice of default until El Paso filed its complaint and amended complaint. El Paso asserts that it put BP on notice on July 20, 2006 when Jerry Ross, manager of marketing for El Paso, sent an e-mail to Kim Patakyn, an employee/representative of BP, the purpose of which was to resolve the imbalances.[34] The e-mail states as follows:

Kim

Now I need your help.. We ar(sic) trying to settle balances at your now defunct Grand Chenier/Gibbstown facility. I think we are in agreement with the imbalances. So who do I need to talk to in order to resolve this financially??

Jerry

El Paso also submits other summary judgment evidence of e-mails dated July 25, 2006, September 6, 2006 and September 11, 2006 which indicate a continuing effort by Mr. Ross to amicably resolve the issue of the under-allocation of condensate.[35] [36]

BP argues that El Paso must have made an express demand for performance citing Brunson Bonding and Ins. Agency, Inc. v. Rebsamen and Assocs.[37] In Brunson, the court held that mere dissatisfaction with a party's failure to perform was not equivalent to a demand for performance and

---

[34] Plaintiff's exhibit 6, ¶ 3

[35] The courts notes that the emails indicate that BP may have been resisting payment because another, possible subsequent operator, Harvest, may have assumed the liability for the under-allocated condensate. However, this has not been an issue presented by the parties.

[36] Exhibit A, attached to Plaintiff's exhibit 6.

[37] 479 So.2d 435, 438 (La.App. 1st Cir. 1985).

11

thus not effective to place one in default. "To put in default a letter need only let the debtor know that his performance is expected and that the creditor stands ready to perform any obligation he has."[38] The purpose of giving notice of default is to provide the obligor the opportunity to perform, in this case to pay the value of the under-allocated condensate. There is no doubt that BP was aware of the imbalance and that El Paso was in fact owed money for the imbalances. Furthermore, there is no doubt that the purpose of Mr. Ross' emails, the first of which was sent on July 20, 2006, some 10 months after Hurricane Rita destroyed the facilities, was to put BP on notice that El Paso expected performance and/or payment for the under-allocated barrels of condensate. Accordingly, the court finds that there is no genuine issue of material fact for trial that BP was put on notice of default as of July 20, 2006 as to the under-allocation and that prejudgment interest shall commence accrual as of that date.

*Specific performance*

El Paso, relying on Louisiana Civil Code article 1986,[39] maintains that because it is the owner of the condensate pursuant to § XI of the Agreement, it is entitled to specific performance by BP to deliver 9,296.36 barrels of condensate. El Paso remarks that both BP and El Paso are in the oil and gas business, thus delivery of 9,296.36 of condensate should be accomplished. BP argues that because the value of a barrel of condensate is markedly higher today than it was when the under-

---

[38] Hafner Mfg. Co. v. Lieber Lumber & Shingle Co., 127 La. 348, 53 So. 646 (1910); Fox v. Doll, 221 La 427, 59 So.2d 443 (1952).

[39] La. Civ. Code article 1986 provides:

Upon an obligor's (BP) failure to perform an obligation to deliver a thing, or not to do an act, or to execute an instrument, the court shall grant specific performance plus damages for delay if the obligee so demands. If specific performance is impracticable, the court may allow damages to the obligee. . . .

12

allocations occurred, the price of the condensate would be grossly disproportionate to the damage caused. BP further remarks that it is no longer the operator of the Facilities and El Paso sold its interest in the producing fields from which it routed product to the Facility. The court finds that because BP ceased its operations at the Facilities, specific performance, or delivery of the condensate pursuant to the Agreement is not mandated.

## CONCLUSION

Based on the foregoing, the motion for summary judgment will be granted in part and denied in part. The motion will be granted to the extent that the court finds in favor of El Paso E&P Company, LP ("El Paso") and against defendant BP America Production Company ("BP") for the value of 6,818.53 barrels of gas condensate and 2,477.83 barrels of retrograde or drip gas condensate; the motion will be granted to the extent that the court sets the accrual of prejudgment interest to commence on July 20, 2006; otherwise, the motion will be denied.

THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana, this 1st day of March, 2012.

JAMES T. TRIMBLE, JR.
U.S. DISTRICT JUDGE